■ In the Matter of DIANA L. BROWN, Respondent, v ERIC H. SKALWOLD, Appellant. [643 NYS2d 732] —Crew III, J.

The parties were married in 1985 and have two children, Leta and Ella. Marital difficulties apparently ensued and, in November 1989, petitioner and respondent entered into a separation agreement, which was incorporated but not merged into the parties' October 1991 judgment of divorce. Pursuant to the terms of the separation agreement, the parties were to have joint legal custody of the children, with physical custody alternating between petitioner and respondent on a yearly basis. The noncustodial parent was provided with visitation during his or her "off" year. Petitioner resided in Maine from 1989 to 1993 and had the children with her from June 1991 to June 1992, and again from June 1993 to June 1994. Respondent remained in the City of Ithaca, Tompkins County, during this time and the children resided with him during the intervening periods, beginning in June 1990.

This arrangement apparently proved workable until November 1993, at which time petitioner asked respondent to allow the children to return to Ithaca; respondent agreed and enrolled the children in school. The children remained with respondent until January 1994, at which time petitioner relocated with the children to New Hampshire and, almost immediately thereafter, to Hawaii, where she resided until February 1994, at which time she moved back to Ithaca. The children remained in petitioner's custody until June 1994 when physical custody switched back to respondent.

Following petitioner's return to Ithaca, the relationship between the parties deteriorated. Petitioner's request for increased visitation with the children apparently was denied by respondent and, in February 1995, petitioner filed an amended petition seeking sole custody of the children and respondent cross-petitioned for similar relief. A hearing was conducted in June 1995, at the conclusion of which Family Court dismissed the respective petitions and continued the joint custody arrangement. This appeal by respondent followed.

A review of the record reveals that the primary issue addressed at the hearing was the parties' alleged inability to communicate and engage in cooperative decision-making with respect to issues affecting the children. Although mindful of the deference traditionally accorded Family Court's findings in this regard, we are of the view that the record establishes that the parties' relationship indeed has deteriorated to the point where joint custody is no longer either appropriate or workable.

It is well settled that "[j]oint custody involves the sharing by the parents of responsibility for and control over the upbring-

ing of their children, and imposes upon the parents an obligation to behave in a mature, civilized and cooperative manner in carrying out the joint custody arrangement" (*Matter of Drummond v Drummond*, 205 AD2d 847, 847-848). To that end, although "[s]uch an arrangement may be ordered * * * where both parties are fit and loving parents, possess a desire to share in the upbringing of their children and have demonstrated a willingness and ability to set aside their personal differences and work together for the good of their children" (*Palmer v Palmer*, 223 AD2d 944, 945), an award of joint custody generally is recognized as inappropriate where the parties are so acrimonious, embattled and embittered as to effectively preclude joint decision-making (*see, Braiman v Braiman*, 44 NY2d 584, 589-590; *Matter of Fedun v Fedun*, 227 AD2d 688).

Here, petitioner candidly testified that she hates respondent and previously has expressed the wish that Susan Titus, who lives with respondent, murder him. Respondent testified that communication between the parties broke down following petitioner's return from Hawaii in February 1994 and that they are no longer able to reach agreement regarding fundamental issues affecting the children, such as the children's need for counseling, the level of the children's extracurricular activities and appropriate methods of discipline.[1] Further, it is apparent from a review of respondent's testimony that he harbors certain beliefs regarding the lifestyle led by petitioner and her spouse and that this, in turn, affects his ability to deal with petitioner in a cooperative fashion. Both Titus and petitioner's husband also testified regarding the parties' deteriorating relationship and, unfortunately, neither has been immune from the fallout.[2]

To be sure, this Court has upheld awards of joint custody where the parties' conduct amounted to nothing more than occasional bickering and their parenting styles, though different, did not impede their ability to work together for the good of the children (*see, e.g., Matter of Fedun v Fedun, supra; Palmer v Palmer, supra*). Here, however, the parties' battles go beyond minor skirmishes (*compare, Matter of Monahan v Monahan*, 178 AD2d 829, 830), their parenting styles may be fairly characterized as widely divergent and, most significantly, there is scant evidence of an ability to put aside their differences and

---

1. Although petitioner cites certain instances of cooperation in her brief, we note that most of these occurred shortly after her return from Hawaii.

2. For example petitioner, who on at least one occasion made derogatory comments about Titus, conceded on cross-examination that she resents the relationship that Titus has developed with the children.

work together for the good of the children (*see, Seidman v Seidman*, 226 AD2d 1011; *Matter of Nicotera v Nicotera*, 222 AD2d 892, 893).

Having concluded that joint custody is no longer appropriate, the issue then becomes to whom custody of Leta and Ella should be awarded. To this end, it is well settled that the primary consideration in any custody matter is the best interest of the child, which, in turn, requires consideration of a number of factors, including "the quality and stability of the respective home environments and each parent's past performance, relative fitness and ability to provide for and guide the child's intellectual and emotional development" (*Matter of Perry v Perry*, 194 AD2d 837; *see, Matter of Belden v Keyser*, 206 AD2d 610, 611; *Matter of Williams v Williams*, 188 AD2d 906, 907). As the record establishes that respondent is more capable of providing the children with a positive and stable environment than petitioner, we deem it appropriate to award custody of the children to him.

Respondent resides with Titus in a two-story residence, located in close proximity to a park, where the children share a bedroom complete with bunk beds, shelves and a work table. Additionally respondent, who has remained in Ithaca throughout this period and enjoys steady employment as a teacher,[3] and Titus, who is an artist and operates a gallery, each testified as to their daily routines with the children and demonstrated that their respective schedules are sufficiently flexible to meet the children's needs. Further, there was substantial testimony as to respondent's active involvement with the children's school and extracurricular activities, and the record reflects Titus' commitment to the children. Additionally, although both parties, to their credit, have attempted to insulate the children from the discord characterizing their relationship, it appears that respondent has been more successful in this en-

---

**3.** In this regard, we cannot overlook petitioner's series of moves with the children between November 1993 and February 1994 which, the record reveals, necessitated the children changing schools three times within this brief period. Additionally, at the time of the hearing in June 1995, petitioner was living in two trailers, with the children sleeping in one trailer and petitioner and her husband sleeping in the other. Neither the trailers nor the converted garage separating them had indoor plumbing; petitioner purchased her drinking water and the only sanitary facilities consisted of a "port-a-potty". During the winter months, the trailers were heated with a series of space heaters. Although petitioner testified, and Family Court found, that she would be relocating to more appropriate surroundings if awarded custody, the fact remains that petitioner's living quarters at the time of the hearing were entirely unsuitable.

deavor and generally is more attuned to the children's emotional needs.

In reaching this conclusion, we are neither suggesting that respondent is a perfect parent[4] nor that petitioner is unfit. Indeed, it is apparent from the record that petitioner loves her children very much and that she sincerely wishes to be an active part of their future, and we have no doubt that she will continue to make positive contributions to their development. As the record presently stands, however, joint custody is no longer appropriate and respondent is better suited to serve as the children's custodial parent.

Cardona, P. J., Mikoll, Casey and Yesawich Jr., JJ., concur. Ordered that the order is modified, on the law and the facts, without costs, by reversing so much thereof as dismissed respondent's cross petition; cross petition granted and matter remitted to the Family Court of Tompkins County for determination of an appropriate visitation schedule for petitioner; and, as so modified, affirmed.

---

4. Indeed, we do not condone respondent's surreptitious recording of telephone conversations with petitioner or his maintenance of an extensive journal detailing his experiences with her, both of which he apparently plans to make available to the children once they reach adulthood for the purpose of explaining "[his] version of the facts".