Matter of MD v TD (2006 NY Slip Op 51303(U))

[*1]

Matter of MD v TD

2006 NY Slip Op 51303(U) [12 Misc 3d 1178(A)]

Decided on June 16, 2006

Family Court, Westchester County

Duffy, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected in part through July 20, 2006; it will not be published in the printed Official Reports.

Decided on June 16, 2006

Family Court, Westchester County
In the Matter of a Proceeding for Custody/Visitation under Article 6 of the Family Court Act MD, Petitioner,
against
TD, SG, Respondents.
V-xxxx

Robert G. Schneider, Esq.
Counsel for Petitioner
92 South Central Avenue
Hartsdale, New York 10530
Sylvia Goldschmidt, Esq.
Counsel for Respondent-father
570 Taxter Road
Elmsford, New York 10523
Izhak Ben-Meir, Esq.
Former Counsel for Respondent-mother
720 Milton Road
Rye, New York 10580
Susan Ferlato, Esq.
Counsel for Respondent-mother
980 Broadway
Thornwood, New York 10594
Thomas F. Fanelli, Jr., Esq.
200 North Central Avenue
Suite 340
Hartsdale, New York 10530

Colleen D. Duffy, J.
On July 2, 2004, Petitioner-grandmother M D filed petitions against her daughter T D and S G, parents of the Subject Child M G (DOB: September 14, 1999 ), for an order of custody of the Subject Child. Thereafter, Petitioner M D also filed a family offense petition seeking an order of protection as against T D on behalf of the Subject Child and herself. On May 17, 2004, the Westchester County Department of Social Services ("DSS") had filed a neglect petition as against the Respondent mother alleging, inter alia, inadequate guardianship. On consent of the parties, the matters were consolidated for the purposes of trial. The trial was commenced on November 16, [*2]2004. The trial continued over the course of a one year period on the following dates: January 28, 2005, February 10, 2005, April 20-21, 2005, June 29, 2005, August 30, 2005 and November 1, 2005. After DSS rested its neglect case, upon motion by Respondent-mother's counsel, the neglect petition was dismissed. The custody aspect of the trial continued and was concluded on November 1, 2005.[FN1]
 While this matter was sub judice, Respondent-mother filed a petition, dated February 7, 2006, seeking to modify this Court's interim order directing supervised visits at the YWCA to obtain unsupervised visits. That petition is hereby dismissed as the interim order has been superceded by this Decision and Order and no substantial change in circumstance has been alleged to warrant a change of visitation from supervised to unsupervised.
Ten witnesses testified in this matter including Petitioner M D and Respondent-mother T D; Maureen O'Mahoney, the Chairperson of the Tuckahoe School District Committee on Pre-School Education; Dr. Mark Burton, the Director of Developmental Pediatrics for the Westchester Institute for Human Development (WIHD), Fred Harmon, a caseworker from Westchester County Department of Social Services Child Protective Services; Dr. Kathleen McKay, Coordinator of the Forensic Evaluation Program at Westchester Jewish Community Services (WJCS); Dr. Dan DelaTorre, a pediatric dentist; Vivian Young, Director of the Community Action Program in Tuckahoe; Amy Goldstein, caseworker from the New York State Office of Developmental Disabilities Westchester Community Mental Health; and Catherine Carmona, a friend and former neighbor of Respondent-mother. In addition, Respondent-father S G appeared, was represented by counsel, and consented to Petitioner M D's petition for custody of the Subject Child.
 While the Court considered all of the testimony and evidence submitted, given the extensive nature of the record, the Court will address only the crucial testimony and documents critical to its decision on the family offense and the custody petitions.
For the reasons set forth below, this Court hereby grants sole legal and physical custody of the Subject Child to Petitioner M D with supervised visitation by Respondent-mother T D as set forth further in this Order. For the reasons set forth below, the Court will issue a one-year order of protection which is attached hereto.
The Court recognizes the fundamental right of a parent to raise and direct the upbringing of a child. Troxel v. Granville, 530 US 57, 58. It is well settled that where a parent and a non-parent seek custody of a child, the parent has a superior right to custody over the non-parent. See Guzzey v. Burton, 632 NYS2d 872 {220 AD2d 976} . In order to prevail in a custody proceeding over a parent, the non-parent has the burden of proving that extraordinary circumstances exist. If extraordinary circumstances are proven, the court then will consider the best interests of the child in making its determination. Matter of Bennett v. Jeffreys, 40 NY2d 543.
Although surrender, abandonment, persistent neglect, unfitness or other matters [*3]typically can constitute extraordinary circumstances, a court may find extraordinary circumstances even in the absence of abandonment, surrender, neglect or grievous misconduct. See O.C. v. L.T., 8 Misc 3d 1006A (2005); In the Matter of Michael G.B. v. Angela L.B., 219 AD2d 289, 291 (no particular set of circumstances qualifies as extraordinary - each case must be evaluated on its own merits).
Here, Petitioner successfully established that extraordinary circumstances exist by credibly establishing the following: (1) the Subject Child is a special needs child with a variety of physical and developmental disabilities that Respondent-mother has failed to adequately address; (2) Respondent-mother T D has had an unstable home situation - residing in at least twelve different places within the child's life (including a shelter, jail, and hospital), and having been evicted from at least one of the residences; and (3) Respondent-mother T D has had and appears to continue to have mental health issues for which she has failed to seek or continue treatment including a five month involuntary hospitalization for psychiatric reasons during the life of the Subject Child.
With respect to the special needs of the Subject Child, there is no dispute that she has a medical diagnosis of neurofibromatosis. Dr. Burton, Ms. O'Mahoney and Dr. McKay credibly testified that the Subject Child also has deficits in speech and language ability and behavioral problems. Dr. McKay and Ms. O'Mahoney also credibly testified that the Subject Child had problems with respect to visual spatial ability and Dr. Burton and Dr. McKay credibly testified that the Subject Child displayed disruptive behavior manifesting as an inability to attend to task as well as tremendous temper tantrums.
Thus, the credible evidence established that the Subject Child has medical issues relating to neurofibromatosis as well as ongoing cognitive and behavioral difficulties. Dr. Burton, Dr. McKay and Ms. O'Mahoney credibly testified that the Subject Child will need ongoing medical monitoring; Dr. McKay testified that the Subject Child will need an endocrinologist and an ophthalmologist, due to the nature of neurofibromatosis which causes a variety of tumors to emerge within the Subject Child's nerve cells throughout her development; that the Subject Child's eye sight is vulnerable due to the neurofibromatosis and that the Subject Child will need ongoing services to address her cognitive functioning, academic functioning and emotional functioning. Ms. O'Mahoney confirmed that the evaluations performed at the behest of the Tuckahoe School District indicated that the Subject Child has severe needs that require "speech therapy as well as placement in a school, a special class, in a special school for children . . ., as well as counseling for parent education, . . . in terms of [the Subject Child's] behavior issues."
With respect to obtaining appropriate services to address the special needs of the Subject Child, although the credible evidence indicates that Respondent-mother had taken the initial steps to obtain early intervention services for her daughter, the overwhelming evidence indicates that once services were no longer provided in the home setting, to wit, once the Subject Child "aged out" of early intervention, Respondent-mother failed to take any affirmative action to ensure that her daughter would continue receiving appropriate services to address her special needs.
Indeed, the credible evidence and testimony demonstrates that from as early as 2002 the Subject Child was not receiving appropriate services of speech, occupational and behavioral therapies. Ms. O'Mahoney credibly testified that Respondent-mother [*4]"refused services" for the school year 2002-2003 from the Tuckahoe School District for the Subject Child after the Subject Child had aged out of the Early Intervention program.
Although Respondent-mother contacted the Tuckahoe School District seeking services for the Subject Child, she did not do so until September 2003 even though the Subject Child had aged out of the Early Intervention Program numerous months prior to that date. Moreover, although Respondent-mother sent a letter to the school district, dated September 17, 2003, seeking services, Ms. O'Mahoney credibly testified that her file contains notes reflecting her predecessor's numerous efforts well before that date to engage Respondent-mother in continuing services for the Subject Child to transition out of the early intervention program.
Moreover, the credible evidence shows that, after attending a December 2003 meeting with the school district about the Subject Child, Respondent-mother failed to take the follow-up steps necessary to allow the school district to provide the services of speech therapy, occupational therapy, behavioral therapy and counseling to the Subject Child. Specifically, Ms. O'Mahoney credibly testified that telephone calls made to Respondent-mother were not returned or "hung up on", that appointments and meetings that were arranged for or with Respondent-mother were not kept by her, and that Respondent-mother failed to follow through with the recommendations made by the school district with respect to services.
Dr. McKay also credibly testified that Respondent-mother failed to recognize the significance of the Subject Child's difficulties and the necessity for ongoing treatment.
Respondent-mother's contention that she followed up with the recommendations of the school district and that the school district failed to assist her when she rejected the proposed service providers suggested by the school district was not credible.
Although Amy Goldstein credibly testified that Respondent-mother initiated contact with her office the New York State Office of Developmental Disabilities Westchester Community Mental Health - seeking home services for the Subject Child via application filed in March of 2004, the Subject Child already had been without services for well over a year at that point. Ms. Goldstein credibly testified that the she was unable to proceed with Respondent-mother's application after an initial meeting in October 2004 as the Subject Child no longer was residing in Westchester County. Thus, the credible evidence shows that Respondent-mother's efforts to obtain services for the Subject Child that she believed were appropriate home based - resulted in depriving the Subject Child of the necessary services of speech, occupational and behavioral therapies for a significant period of time and did not yield any alternative services for the Subject Child.
Although both Respondent-mother and Ms. Yancy credibly testified that Respondent-mother regularly utilized the programs and services offered by the Eastchester Community Action Program, and attended the program's center in Tuckahoe with the Subject Child on a regular basis, no evidence was shown that such services and programs were geared to address the Subject Child's special needs.
Ms. Yancy testified that the services provided by the Eastchester Community Action Program included a food pantry, employment bulletin, drug and alcohol referrals, thrift shop, and recreational youth programs. She also credibly testified that the [*5]services utilized by Respondent-mother and the Subject Child, to wit, the "recreational program" at the center, contained books, toys, and other types of items for play activity which the Subject Child used with Respondent-mother. However, there is no evidence whatsoever that any program offered by the Eastchester Community Action Program in any way addressed the Subject Child's need for occupational, behavioral and speech therapy.
Indeed, Respondent-mother's own witness Dr. Burton was unable to state whether or not the services speech, occupation, and behavioral therapy that were recommended for the Subject Child and that he believed were necessary - were obtained for the child by Respondent-mother.
In addition, Dr. McKay credibly testified that the extent of the Subject Child's difficulties requires a custodian who can demonstrate "significant cooperation " with school personnel and care providers entailing an individual "who is amenable to suggestions and structures and efforts to contain disruptive behavior and facilitate adaptive behaviors." Dr. McKay found that, based on her forensic assessment, Respondent-mother, without proper mental health treatment, could not cooperate with providers or be amenable to their suggestions. She credibly testified that Respondent-mother "would have to struggle to maintain a cooperative interaction" with the Subject Child's various care providers by virtue of her "almost individualistic perception as to when treatment is needed, when treatment is not needed."
Indeed, as noted above, Respondent-mother already has evidenced her inability to work with school and care providers and demonstrated her opposition to pursue any recommended services that she did not believe were appropriate - even in the face of all the recommendations of the Subject Child's doctor - Dr. Burton, the evaluations performed by psychologists and therapists from the school district, and the recommendations from the Tuckahoe School District's Committee on Special Education.
Ms. O'Mahoney credibly testified that Respondent-mother failed to work with the school district to ensure that the Subject Child could receive the services she needed by failing to engage in communication with school authorities, failing to follow through with respect to recommendations for services and failing to provide appropriate information or attend meetings to obtain the necessary services.
The extent and severity of the Subject Child's needs - expressive and receptive language delays, severe behavioral problems and her physical difficulties related to the neurofibromatosis -, and Respondent-mother's failure to properly address these needs, standing alone, under the facts of this case, could constitute extraordinary circumstances sufficient to confer standing on Petitioner M D. See Matter of Susan Hansen v. William Post, et al., 167 AD2d 702, 703-4 (App. Div. Third Dept. 1990)(extraordinary circumstances exist for standing by non-parent to seek custody where a severely emotionally disturbed child was facing oncoming crisis that parents were unwilling and unable to address in appropriate manner); see also Michael G.B at 291.
Here, however, the Court need not find that those facts alone constitute extraordinary circumstances as other factors also exist that evidence the existence of extraordinary circumstances to confer standing on Petitioner M D.
With respect to the issue of a stable home life, the credible testimony of [*6]Petitioner M D established that her daughter Respondent-mother has had a nomadic existence during the life of the Subject Child with respect to a home. There is no dispute that Respondent-mother has relocated numerous times in Westchester County during the life of the Subject Child, as well as living with Petitioner M D in the Bronx for approximately eight weeks in 2002. There also is no dispute that Respondent-mother has resided in a shelter with the Subject Child and also has been evicted from at least one of the apartments in which she resided with the Subject Child.
In 2000, when the Subject Child was approximately five months old, Respondent-mother was involuntarily hospitalized for psychiatric reasons for a five month period of time during which time the Subject Child was cared for by Respondent-mother's sister and Petitioner M D. Respondent-mother also was incarcerated from December 2001 to January 2002 in connection with an alleged violation of an order of protection in favor of Respondent-father.
Dr. McKay credibly testified that the special needs of the Subject Child require a "highly structured and predictable setting" in which the Subject Child could receive as much one-on-one attention as possible as well as specific guidance and directiveness with regard to behavior. Respondent-mother's lack of a consistent stable residence and her intermittent absences from the Subject Child due to hospitalization and incarceration have precluded her from providing such a setting for the Subject Child.
With respect to the issue of Respondent-mother's mental health, Dr. McKay and Petitioner M D credibly testified that Respondent-mother T D has been diagnosed with bi-polar disorder. It is not refuted that Respondent-mother was hospitalized for mental health reasons for an extended period of time approximately five months after the Subject Child was born. The Court also notes that Dr. McKay expressed concern about Respondent-mother's mental status at the time of Respondent-mother's examination.
Respondent-mother contends that her hospitalization in 2000 was due to depression following the birth of the Subject Child. Petitioner M D credibly testified that Respondent-mother was involuntarily hospitalized for erratic and bizarre behavior that manifested in Respondent-mother ranting, raving and screaming as well as engaging in contradictory behavior from one moment to the next - including seeking help and assistance from her parents and then wholly rejecting it.
Petitioner M D credibly testified that in 2000 her family called the Emergency Crisis Unit because of Respondent-mother's behavior and the family's concern for the welfare of Respondent-mother and the Subject Child and, as a result, Respondent-mother was involuntarily hospitalized at the Westchester County Medical Center.
According to Petitioner M D, Respondent-mother's erratic behavior and her "ranting and raving" did not cease when she was discharged from the hospital in 2000. Petitioner M D credibly testified that in 2002, after Respondent-mother was released from jail and she and the Subject Child were residing with Petitioner, Respondent-mother regularly screamed at her and threatened her even in the presence of the Subject Child.
Moreover, Petitioner M D also credibly testified that Respondent-mother's aggressive behavior towards her, including in the presence of the Subject Child, had continued up until the Court issued the Order of Protection on the Subject Child's behalf [*7]as against the Respondent-mother. Specifically, Petitioner testified that, although she was granted court-ordered visitation with the Subject Child in early 2004 when Respondent-mother had custody, Respondent-mother repeatedly refused to provide the child to Petitioner for such court-ordered visits, yelling invectives at her in the presence of the Subject Child and disparaging her to the Subject Child. Petitioner credibly testified that police intervention was required to effectuate such visits.
Petitioner also credibly testified that Respondent-mother's aggressive behaviors increased upon the Court's awarding temporary custody of the Subject Child to Petitioner in October 2004, including making threats and invectives in front of the Subject Child, and making telephone calls to school authorities and child protective services.
Respondent-mother's contention that her feelings and behavior towards her mother arose out of abuse she suffered from her mother as a child , and not out of any mental health issues of her own, is not credible. The Court notes that Respondent admitted having resided with Petitioner at least twice after she had reached adulthood - most recently in 2002. These voluntary stays with her mother undercut any contention that she suffered abuse by her mother as a child. Respondent admitted that, in the past, doctors prescribed medicines for her with respect to her mental health but she declined to take the medications and that in the past, legal proceedings were commenced to compel her to take medication. Respondent admitted that she was required to take Depacote and Respirdol by a Mental Hygiene Court in the past. Respondent testified that she currently is not taking any medication for mental health.
The credible evidence indicates that Respondent-mother has serious mental health issues that should be addressed but there is no credible evidence to indicate that Respondent-mother is receiving any appropriate ongoing treatment for these issues that she continues to present. Indeed, the credible evidence shows that Respondent-mother has failed to engage in any continuous follow-up treatment after she was discharged from Westchester County Medical Center in 2000.
Although Respondent-mother may have sought out more than three mental health professionals after her hospitalization in 2000, there is no credible evidence that she has had continuous treatment from any one provider for any sustained period. Indeed, Dr. McKay credibly testified that Respondent-mother has failed to acknowledge her need for mental health treatment or evaluation and has not sought any ongoing treatment. Dr. McKay opined that she believed Respondent-mother should be evaluated to ascertain whether medication would be appropriate for Respondent-mother.[FN2]
Dr. McKay also testified that, at the time Respondent-mother was evaluated by Dr. McKay's team at Westchester Jewish Community Services, there was "some concern about [her] mental status" in that Respondent-mother lacked any concern about her then-imminent eviction from her home with no plan for housing. Dr. McKay found [*8]that Respondent-mother's "emotional and interpersonal difficulties and the absence of any ongoing treatment," as well as Respondent-mother's failure to appreciate her daughter's difficulties and seek appropriate treatment for them" has seriously compromised her parental capacity and puts the Subject Child "at imminent risk" if custody of the Subject Child were to be returned to Respondent-mother.
The Court credits the testimony of Dr. McKay as an expert in forensic assessment, and finds, that the instability of Respondent-mother's home during the Subject Child's life, and Respondent-mother's lack of ongoing treatment for her mental health issues, combined with the severe special needs of the Subject Child which Respondent-mother has not properly addressed, constitute extraordinary circumstances sufficient to confer standing upon Petitioner M D to seek custody of the Subject Child. . See O.C. v. L.T. at 1006A; Michael G.B. at 291; see also Hansen v. Williams at 704.
Having found extraordinary circumstances, the Court now turns to the issue of custody of the Subject Child. It is axiomatic that in adjudicating custody and visitation rights, the most important factor to be considered is the best interests of the child in view of all the circumstances. Bennett v. Jeffreys at 543; McDonald v. McDonald, 216 AD2d 276 (App. Div. 2nd Dept. 1995); Ford v. Peele, 250 AD2d 767 (App. Div. 2nd Dept. 1998).
The record in this case clearly establishes that joint custody of the Subject Child between Petitioner and Respondent-mother is wholly inappropriate in light of Respondent-mother's extreme rancor toward her mother. It is well settled that "joint custody involves the sharing . . . of responsibility for and control over the upbringing [of the child]. . .and imposes . . . an obligation to behave in a mature, civilized and cooperative manner in carrying out joint custody." Brown v. Skalwold, 643 NYS2d {228 AD2d 749} 732 quoting, Drummond v. Drummond, 205 AD2d 847. . The credible testimony establishes that Respondent-mother would be unable to communicate or engage in cooperative decision making with Petitioner with respect to issues affecting the child. Brown v. Skalwold, 643 NYS2d 732 {228 AD2d 749} .
Indeed, the credible testimony establishes that Petitioner has in the past sought and obtained an order of protection against Respondent-mother. Moreover, even absent an order of protection, the credible evidence shows that Respondent-mother has not been able to communicate with Petitioner in any reasonable or cooperative manner.
Thus, as joint custody is not appropriate, the primary consideration with respect to determining custody of the Subject Child is the best interest of the child considering a variety of factors including the quality and stability of the respective home environments, the parties' past performance with respect to parenting, and the relative fitness and ability to provide for and guide the child's intellectual and emotional development. Id.
Based on the reasons set forth above and below, the Court finds that the Subject Child's best interests are served by granting Petitioner sole legal and physical custody of the Subject Child.
Here, although it is undisputed that Respondent-mother had a very close bond with her daughter when she had custody of the child, the credible evidence shows that her parental capacity is significantly compromised by her failure to obtain ongoing [*9]treatment for her mental health issues and her failure to recognize and address the significant special needs of her daughter.
Although the Court found credible the testimony of both Ms. Yancy and Ms. Carmona regarding Respondent-mother's calmness and patience with her daughter and her loving relationship towards her daughter, the Court notes that the evidence shows that Respondent-mother's patience with her daughter also manifested as permissiveness and an inability to appropriately set boundaries and limits including ensuring that the Subject Child keep her clothes on and eat healthy, nourishing foods rather than sugar-laden items.
Dr. McKay credibly testified that although Respondent-mother was very attached to her daughter, she seemed excessively permissive and did not demonstrate the ability to provide a degree of structure or direction necessary to address the Subject Child's behavioral difficulties. Dr. McKay also testified that permissiveness with respect to raising the Subject Child at this point in her development precludes good parenting. Dr. McKay opined that the Subject Child faced imminent risk of neglect if custody were returned to Respondent-mother.
Although Petitioner readily acknowledged the warm and close relationship that Respondent-mother shared with the Subject Child, she credibly testified about repeated behaviors exhibited by Respondent-mother towards Petitioner - screaming, ranting, yelling invectives - in front of the Subject Child that caused the child to "tremble and cry." Petitioner also credibly testified that although "[Respondent-mother] was as good a parent as she could be," the Subject Child had needs that were beyond Respondent-mother's ability to provide. Specifically, Petitioner was concerned about the Subject Child's hygiene, nutrition (she contended Respondent-mother gave the Subject Child too many sugar-laden foods) and grooming, and Respondent-mother's failure to obtain services necessary to address the Subject Child's special needs.
With respect to Petitioner's parenting abilities, the Court did not find credible Respondent-mother's testimony that she suffered abuse by Petitioner when she was a child. The Court also notes that the credible testimony of Petitioner and Dr. McKay establishes that Petitioner shares a close relationship with her granddaughter and that Petitioner has been totally appropriate with respect to disciplining the Subject Child during the time that she has had interim physical custody.
The Court credits Dr. McKay's assessment that Petitioner is capable of providing the structure and care needed by the Subject Child. Dr. McKay credibly testified that Petitioner has a "very vigilant manner and is very in-tune and astute with regard to [the Subject Child's] needs, both behavioral and emotional. She provides a great deal of structure for [the Subject Child] in terms of consistently reinforcing [the Subject Child's] behavior or positive behaviors and drawing attention to behaviors that need modification.
Petitioner also credibly testified that when she initially took interim custody of the Subject Child in October 2004, the Subject Child "appeared like she was emotionally traumatized. If she didn't get what she wanted, she would trash the room, scream, and kick and spit . . . she threw a tantrum. And[sic] she would knock all the dishes off the table, take , do whatever." Since that time, Petitioner testified, the Subject Child's behavior "ha[s] diminished. It's not as intense and it's not as often because she now [*10]understands she must wait and there are consequences to her behaving like that such as a time out." Petitioner credibly testified that as a result of receiving a time out - sitting in a chair at the table for five minutes - the Subject Child has "less tantrums and less often. She's beginning to manage to control her behavior."
The Court also notes that Respondent's own witness Dr. Delatore, the Subject Child's dentist, observed that from the time of first treating the Subject Child in or about February 2004 through April 2005, the child's behavior has "progressively gotten better and better in acceptance of the [dental] treatment, in other words, she's a more cooperative patient."
The credible evidence also shows that the Subject Child has been receiving appropriate services - occupational therapy, speech and behavioral therapy - while Petitioner has had custody of the Subject Child.
With respect to the issue of the relationship between the Subject Child and the Petitioner, the evidence shows that the Court's interim order of custody to Petitioner is not the first time that Petitioner has had caretaking responsibility for the Subject Child. Indeed, the unrefuted evidence shows that Respondent-mother and the Subject Child resided with Petitioner for approximately six weeks after the Subject Child was born. Petitioner credibly testified that she assisted Respondent-mother with the care of the child at that time.
Thereafter, when the Subject Child was approximately five months old, Petitioner and Respondent-mother's sister assumed caretaking responsibility for the Subject Child while Respondent-mother was involuntarily hospitalized for approximately five months. Petitioner credibly testified that, from time to time thereafter, Petitioner would assist Respondent-mother with the care of the Subject Child, including during the three week period from December 2001 to January 2002 when Respondent-mother was incarcerated, and thereafter during the eight week period when Respondent-mother again resided with Petitioner after she was incarcerated.
All of the credible evidence demonstrates that Petitioner has played a significant role in the upbringing of the Subject Child and currently shares a close and loving relationship with her. Moreover, the credible evidence shows that Petitioner recognizes the significant needs of the Subject Child, has worked with the service providers to ensure that the Subject Child receives appropriate services, and imposes appropriate behavioral limits consistent with the Subject Child's special needs.
For all of the foregoing reasons, the Court finds that it is in the best interests of the Subject Child for sole legal and physical custody of the Subject Child to be awarded to Petitioner M D.
Turning to the issue of the Respondent-mother's access to the Subject Child, the Court finds that, for the reasons set forth herein, supervised visitation between the Subject Child and Respondent-mother is the only appropriate access at this time, consistent with the best interests of the Subject Child.
As an initial matter, the Court finds that, as noted above, the animosity and aggressive behavior displayed by Respondent-mother in the presence of the Subject Child caused the Subject Child fear and alarm which constitutes harassment in the second degree sufficient to warrant the issuance of a permanent order of protection for a one year period. The issuance of the order of protection against Respondent-mother [*11]in favor of the Subject Child ensures that any interaction between the mother and her child will be safe and harmonious for the Subject Child.
The Court finds Petitioner's testimony regarding Respondent's behavior in the presence of the Subject Child both prior to and during Petitioner's having custody of the Subject Child raises serious concerns about the safety and well being of the child if the Subject Child were to be with her mother in an unsupervised setting.
Specifically, Respondent's failure to provide the Subject Child to Petitioner for court ordered visits in 2004 - even with police intervention - raises strong concerns that the Subject Child would not be returned to Petitioner if any access to the Subject Child by Respondent-mother were unsupervised. Petitioner credibly testified that, on more than one occasion, the
Subject Child was crying and visibly shaking due to Respondent-mother's aggressive behavior when Petitioner arrived to pick up the Subject Child for court ordered visits.
Moreover, Respondent-mother acknowledged that she was involved in a disturbance with respect to the bus that her daughter was on demanding information about where the Subject Child was going even after the Court had ordered interim custody to Petitioner. Such an incident in the presence of the Subject Child could only have been detrimental to the Subject Child's well being. Respondent-mother also admitted making at least one telephone call to CPS while Petitioner has had custody of the Subject Child and also admitted that she telephoned school authorities regarding her daughter even after interim custody was granted to Petitioner.
In addition, Petitioner also credibly established that Respondent has wholly disregarded the impact that hostile, inappropriate and disparaging comments that she made to and about Petitioner may have had and have on the Subject Child. The Court credits the testimony of Petitioner with respect to the invectives and aggressive behavior Respondent-mother has directed towards Petitioner in the presence of the Subject Child. Petitioner credibly testified that Respondent-mother yelled at her, cursed at her, threatened her and disparaged her on numerous occasions in the presence of the Subject Child. Petitioner also credibly testified that the Subject Child was crying and upset at such actions. Such behavior by Respondent-mother necessarily precludes any unsupervised access by Respondent-mother to the Subject Child at this time and mandates the issuance of an order of protection for one year under the terms and conditions of the temporary order.
Dr. McKay also credibly testified that she had significant concerns about unsupervised visits between Respondent-mother and the Subject Child and expressed concerns that Respondent-mother inappropriately gave the Subject Child "false hope" by telling her that as soon as they went to Court, the Subject Child would return to live with Respondent-mother.
The credible evidence shows that, given the animosity demonstrated by Respondent-mother towards Petitioner, the behavior manifested by Respondent-mother in the presence of the Subject Child resulting in upsetting the child, supervised visits are the only mechanism to ensure that Respondent-mother's interaction with the Subject Child is appropriate, devoid of disparagement about Petitioner, and minimizes the risk that the Subject Child will be upset by Respondent-mother or not be returned to Petitioner.
[*12]
Accordingly, it is hereby
ORDERED that sole legal and physical custody of the Subject Child is granted to Petitioner M D with all access to the Subject Child by Respondent-mother to be supervised by Supervised Visitation Experts or other supervisory agency approved by the Court for a minimum of one hour per week. Respondent-mother shall stay away from the Subject Child at all other times and stay away from her school and other locations where the Subject Child receives speech, occupational therapy and behavioral therapy or counseling; and it is further
ORDERED that the petition filed by Respondent-mother, dated February 6, 2006, seeking modification of an interim order of visitation by this Court, Docket Number V-xxxx, is hereby dismissed as moot and for failure to allege any change in circumstance sufficient to obtain the requested relief of unsupervised visits.
This constitutes the Decision and Order of this Court.
DATED: June 16, 2006
 Yonkers, New York
ENTERED:
___________________________
COLLEEN D. DUFFY
FAMILY COURT JUDGE
DISTRIBUTION

Footnotes

Footnote 1:Prior to the trial's conclusion, pursuant to Notice of Motion, dated October 11, 2005, Respondent-mother T D moved for a mistrial; and, in the alternative, for an order relieving assigned counsel Izhak Ben-Meir from representing Respondent-mother. The Court denied the motion in its entirety, pursuant to a Decision and Order, entered February 8, 2006 (the February 2006 Order).

Footnote 2: Dr. McKay testified that she is not licensed to prescribe medication but that, as part of her job responsibilities, she does make refer clients to psychiatrists with recommendations for medication interventions.